195 P.2d 662

### KEENAN v. PRICE.
### No. 7464.

Supreme Court of Idaho.
June 30, 1948.

James H. Hawley and R. W. Beckwith, both of Boise, for plaintiff in error.

Robert E. Smylie, Atty. Gen. and John A. Carver, Jr., J. R. Smead, Don J. Mc-Clenahan and J. N. Leggat, Asst. Attys. Gen., for defendant in error.

HYATT, Justice.

Plaintiff, alleging that he possesses the required qualifications for holding the office of governor and seeks the nomination of the Democratic Party therefor at the coming nominating election of August 10, 1948, brought this original proceeding for a writ of mandate to compel the defendant Secretary of State, to accept and file his declaration and petitions for candidacy and to certify his name to the county

auditors as a candidate to be voted on at said election, thereby directly challenging the validity of the amendment of Sec. 1, Article IV of our Constitution, approved and ratified by a majority vote of the electors at the general election held November 7, 1944, which changed the terms of constitutional state officers from two to four years and provided that the governor should not succeed himself except after a lapse of one full term, and indirectly challenging the right of such officers elected in 1946, after the effective date of the amendment, to hold their offices longer than two years or without re-election in 1948.

We accepted jurisdiction and issued an alternative writ to the defendant to accept said filing and make such certification, or show cause why he had not done so, only because of the importance of the questions presented and the urgent necessity for immediate determination thereof occasioned by the brevity of time for filing declarations and petitions of candidacy for said nominating election under Sec. 33-605, I.C.A. as amended by Sec. 4, Chap. 2, Laws 1st Ex.Sess.1944, which would not permit of the ordinary method of the proceeding being instituted in a district court and brought here on appeal for decision prior to expiration of such filing date. Love v. Wilcox, 119 Tex. 256, 28 S.W.2d 515, 70 A.L.R. 1484, at page 1493.

The grounds on which plaintiff attacks the validity of the foregoing amendment, which are squarely traversed by the defendant's answer to the alternative writ, will be hereinafter set forth and discussed.

Prior to its presently contested amendment, Sec. 1 of Article IV of our Constitution, read:

Executive officers listed—Term of office—Place of residence—Duties.—The executive department shall consist of a governor, lieutenant governor, secretary of state, state auditor, state treasurer, attorney general, and superintendent of public instruction, each of whom shall hold his office for two years beginning on the first Monday in January next after his election, except as otherwise provided in this constitution. The officers of the executive department, excepting the lieutenant governor, shall, during their terms of office, reside at the seat of government, where they shall keep the public records, books and papers. They shall perform such duties as are prescribed by this constitution and as may be prescribed by law.

From the record, and Journal of the State Senate, 27th Session (1943), page 142, it appears that the amendment in controversy was originally proposed by S.J.R. No. 1, reading as follows:

A Joint Resolution

Proposing an Amendment to Section 1, of Article 4, of the Constitution of the State of Idaho by providing that the

Executive Department shall consist of a Governor, Lieutenant Governor, Secretary of State, State Auditor, State Treasurer, Attorney General, Superintendent of Public Instruction and Inspector of Mines; Providing that each shall hold office for four years beginning the first Monday in January next after his election commencing with those elected in the year 1946; Providing that the Governor may not succeed himself in office and directing the Secretary of State to publish this proposed Amendment.

"Be it Resolved by the Legislature of the State of Idaho:

"Section 1. That Section 1 of Article 4 of the Constitution of the State of Idaho be amended to read as follows:

"Section 1. The executive department shall consist of a governor, lieutenant governor, secretary of state, state auditor, state treasurer, attorney general, * * * superintendent of public instruction, *and inspector of mines,* each of whom shall hold his office for * * * *four* years beginning on the first Monday in January next after his election, *commencing with those elected in the year 1946,* except as otherwise provided in this constitution. The officers of the executive department, excepting the lieutenant governor, shall, during their terms of office, reside * * * *within the county where the seat of Government is located,* where they shall keep the public records, books and papers. They

shall perform such duties as are prescribed by this constitution and as may be prescribed by law. *The Governor shall not succeed himself in office, but he shall be eligible to hold such office after a lapse of one full term.*

"Section 2. The question to be submitted to the electors of the State of Idaho in the next general election shall be as follows:

"Shall Section 1 of Article 4 of the Constitution of the State of Idaho be amended to read as follows:

"The executive department shall consist of a governor, lieutenant governor, secretary of state, state auditor, state treasurer, attorney general, superintendent of public instruction and inspector of mines, each of whom shall hold his office for four years beginning on the first Monday in January next after his election, commencing with those elected in the year 1946, except as otherwise provided in this constitution. The officers of the executive department, excepting the lieutenant governor, shall, during their terms of office reside within the county where the seat of Government is located, where they shall keep the public records, books and papers. They shall perform such duties as are prescribed by this constitution and as may be prescribed by law. The Governor shall not succeed himself in office, but he shall be eligible to hold such office after a lapse of one full term.

"Section 3. The Secretary of State is hereby directed to publish this proposed constitutional amendment for six consecutive weeks prior to the next general election in one newspaper of general circulation published in each county of the State."

After being passed by the Senate, a motion for reconsideration carried, and the Resolution was committed to the Committee of the Whole. Amendments were then offered and made (p. 163 Sen.Jour.) by striking the words "inspector of mines" from the title and also Sections 1 and 2.

This Committee reported out the Resolution with the recommendation that it pass as amended. The original engrossed copy thereof filed in the office of the Secretary of State (although duplicate engrossed copies thereof also filed in such office contain the words "state auditor" in Section 1), reads as follows:

"A Joint Resolution

"Proposing an Amendment to Section 1, of Article 4, of the Constitution of the State of Idaho by providing that the Executive Department shall consist of a Governor, Lieutenant Governor, Secretary of State, State Auditor, State Treasurer, Attorney General, and Superintendent of Public Instruction * * *; Providing that each shall hold office for four years beginning the first Monday in January next after his election commencing with those elected in the year 1946; Pro-

viding that the Governor may not succeed himself in office and directing the Secretary of State to publish this proposed Amendment.

"Be It Resolved by the Legislature of the State of Idaho:

"Section 1. That Section 1 of Article 4 of the Constitution of the State of Idaho be amended to read as follows:

"Section 1. The executive department shall consist of a governor, lieutenant governor, secretary of state, state treasurer, attorney general *and* superintendent of public instruction, * * * each of whom shall hold his office for *four* years beginning on the first Monday in January next after his election, *commencing with those elected in the year 1946,* except as otherwise provided in this constitution. The officers of the executive department, excepting the lieutenant governor, shall, during their terms of office, reside * * * *within the county where the seat of government is located,* there they shall keep the public records, books and papers. They shall perform such duties as are prescribed by this constitution and as may be prescribed by law. *The governor shall not succeed himself in office, but he shall be eligible to hold such office after a lapse of one full term.*

"Section 2. The question to be submitted to the electors of the State of Idaho in the next general election shall be as follows:

"Shall Section 1 of Article 4 of the Constitution of the State of Idaho be amended to read as follows:

"The executive department shall consist of a governor, lieutenant governor, secretary of state, state auditor, state treasurer, attorney general, *and* superintendent ·of public instruction * * *, each of whom shall hold his office for four years beginning on the first Monday in January next after his election, commencing with those elected in the year 1946, except as otherwise provided in this constitution. The officers of the executive department, excepting the lieutenant governor, shall, during their terms of office reside within the county where the seat of government is located, where they shall keep the public records, books and papers. They shall perform such duties as are prescribed by this constitution and as may be prescribed by law. The Governor shall not succeed himself in office, but shall be eligible to hold such office after a lapse of one full term.

"Section 3. The Secretary of State is hereby directed to publish this proposed constitutional amendment for six consecutive weeks prior to the next general election in one newspaper of general circulation published in each county of the State."

The original enrolled Resolution as signed by the President of the Senate and Speaker of the House and certified by the Secretary of the Senate, and as contained at page 380, 1943 Laws, and page 394, 1945 Laws, is in the identical language as the engrossed original hereinabove set forth.

Plaintiff first attacks the amendment on the ground that it was not adopted in compliance with Article XX, Sec. 1 of the Constitution reading as follows:

"How amendments may be proposed.— Any amendment or amendments to this constitution may be proposed in either branch of the legislature, and if the same shall be agreed to by two-thirds of all the members of each of the two houses, voting separately, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and it shall be the duty of the legislature to submit such amendment or amendments to the electors of the state at the next general election, and cause the same to be published without delay for at least six consecutive weeks, prior to said election, in not less than one newspaper of general circulation published in each county; and if a majority of the electors shall ratify the same, such amendment or amendments shall become a part of this constitution." in that the words "state auditor" being omitted from Sec. 1, there is a definite conflict between the proposed amendment and the question submitted to the voters, relying on the rule announced in McBee v. Brady, 15 Idaho 761, 100 P. 97, 104, and Lane v. Lukens, 48 Idaho 517, 283 P. 532, that "the questions submitted should be the same questions proposed as the amend-

ment or amendments," and "the Legislature cannot propose one question and submit to the voters another."

Therefore, by reason of such omission, we are first asked to declare the amendment null and void, although the question containing the words "state auditor," was approved by a majority vote of the electors in 1944 (and so certified by the Secretary of State, 1945 Sess.Laws, p. 394), and one election has been heretofore held thereunder.

At the outset, we reiterate certain definite and fundamental principles by which courts are initially guided in passing upon the validity of constitutional amendments.

" * * * in determining its validity the court will presume that the Legislature acted regularly in submitting the same to the voters of the state and will uphold and sustain the validity of such amendment, unless it appears that the same has not been submitted and adopted in accordance with the provisions of the Constitution of this state which regulates and controls the method and manner of amending such Constitution." McBee v. Brady, 15 Idaho 761, at page 773, 100 P. 97.

" * * * and here as always we enter upon a consideration of the validity of a constitutional amendment after its adoption by the people with every presumption in its favor: The question is not whether it is possible to condemn the amendment, but whether it is possible to uphold it, and we shall not condemn it unless in our judgment its nullity is manifest beyond a reasonable doubt." State v. Cooney, 70 Mont. 355, 225 P. 1007, at page 1009.

"In the case of statutes passed by the legislative assembly and assailed as unconstitutional the question is not whether it is possible to condemn, but whether it is possible to uphold; and we stand committed to the rule that a statute will not be declared unconstitutional unless its nullity is placed, in our judgment, beyond reasonable doubt * * *. The application of this rule is especially commanded in the case of an amendment to the Constitution solemnly and decisively adopted, the invalidity of which is charged to the method of its submission and made dependent upon a possible theory of its nature." State v. Alderson, 49 Mont. 387, 142 P. 210, at page 212, Ann.Cas.1916B, 39.

"The view is taken that substance is more important than form, and that the will of the legislature lawfully expressed in proposing an amendment and the will of the people expressed at the proper time and in the proper manner in ratifying such amendment ought not to be lightly disregarded." 11 Am.Jur. 638.

"In State v. Winnett, 78 Neb. 379, 110 N.W. 1113, 10 L.R.A.,N.S., 149, 15 Ann. Cas. 781, a case involving the point being considered, the court said: 'the self-im-

posed limitations on the power of the people to amend their fundamental law should not be so construed as to defeat the will of the people, plainly expressed, on account of a slight and unimportant failure to comply literally with such limitations, if the requirements are substantially observed.'" Swanson v. State, 132 Neb. 82, 271 N.W. 264, at page 267.

"Another factor which must be noted and which must govern in the determination of this issue is 'that every reasonable presumption, both of law and fact, is to be indulged in favor of the validity of an amendment to the Constitution when it is attacked *after its ratification by the people.'* People ex rel. Elder v. Sours, etc., 31 Colo. 369, 74 P. 167, 169, 102 Am.St.Rep. 34. In Sandell et al. v. City of Omaha et al., 115 Neb. 861, 215 N.W. 135, the court adopted and approved this rule. See, also, Lovett v. Ferguson, 10 S.D. 44, 71 N.W. 765.

"The people are presumed to know what they want, to have understood the proposition submitted to them in all of its implications, and by their approval vote to have determined that this amendment is for the public good and expresses the free opinion of a sovereign people." Larkin v. Gronna, 69 N.D. 234, 285 N.W. 59, at page 63.

██ Courts should, after an amendment has been adopted, be slow to declare the same unconstitutional on technical grounds, unless the substantial requirements of the constitution have been violated in the submission. State ex rel. Lampson v. Cook, 44 Ohio App. 501, 185 N.E. 212. "The two important vital elements in any constitutional amendment, are, the assent of two-thirds of the legislature, and a majority of the popular vote. Beyond these, other provisions are mere machinery and forms. They may not be disregarded, because, by them, certainty as to the essentials is secured but they are not themselves the essentials." Per Brewer, Justice. Constitutional Prohibitory Amendment Cases, 24 Kan. 700, at page 710. See also Mundell v. Swedlund, 58 Idaho 209, at page 225, 71 P.2d 434.

It is manifest that the legislature never amended the Resolution as introduced to eliminate the state auditor from Sec. 1. Reference to the Senate Journal, page 163, shows the amendment of S.J.R.No.1 by striking only the "inspector of mines" therefrom; that the Committee of the Whole recommended its passage as so amended; that it was read for the first time as amended (p. 170); that it was read for the second time as amended and referred to the Engrossed and Enrolled Bills Committee for engrossing (p. 178); that it was read the third time as amended and placed before the Senate for final consideration (p. 192), and thereupon passed by two-thirds vote. The House Journal shows receipt of S.J.R. No.1 as amended in the Senate, and that it passed the House, as received, by a two-thirds vote.

■ We take judicial notice of the public and private acts of the legislature (Sec. 16-101 (3), I.C.A.), and the Journals of the legislative bodies to determine whether an act of the legislature was constitutionally passed and for the purpose of ascertaining what was done by the legislature. Burkhart v. Reed, 2 Idaho, Hasb., 503, 509, 22 P. 1; State v. Eagleson, 32 Idaho 280, 181 P. 935.

Under Sec. 65-605, I.C.A. it is the duty of the secretary of the Senate and chief clerk of the House at the close of each session of the legislature, to mark, label and arrange all bills and papers belonging to the archives of their respective houses, and to deliver the same, together with all the books of both houses, to the Secretary of State, who shall certify the reception of the same, and under Sec. 65-801, I.C.A., the Secretary of State is charged with the custody of all acts and resolutions passed by the legislature, the journals of the legislature, and all records and papers deposited in his office pursuant to law. We may therefore also take judicial notice of such records and papers so deposited.

It is apparent from the Senate journal and the legislature's records deposited in the office of the Secretary of State, that the elimination of the words "state auditor" from Sec. 1 of the Resolution, as amended, was purely a clerical error by the engrossing clerk, which escaped the attention of both houses.

While perhaps not controlling in the situation here, nevertheless, as somewhat parallel, it has been held that an enrolled bill is not conclusive to the extent that it is impaired by omissions of the enrolling clerk in the copying thereof.

In Rice v. Lonoke-Cabot Road, etc., Dist. No. 11, 142 Ark. 454, 221 S.W. 179, 181, it was said:

"The chief insistence for reversal is that the bill approved by the Governor was a different bill from the bill passed by the Legislature. An enrolled bill, in Legislative parlance, is a reproduction or copy of the identical bill passed by both houses of the General Assembly. The enrolling clerk or committee has no power or authority to modify a bill passed by the General Assembly in any respect. It follows that the purpose and intention of the Governor in signing an enrolled bill, or in allowing an enrolled bill to become a law without his signature, is to approve the bill passed by both branches of the Legislature, or to acquiesce in such bill becoming a law. In approving an enrolled bill, therefore, it may aptly be said that the Governor intends to, and does, approve the original or identical bill passed by the General Assembly. For this reason additions, omissions, or misprisions of the enrolling clerk in copying the bill to be signed by the Speaker of the House and President of the Senate and to be presented to the Governor do not impair or invalidate the act. Otherwise legislation would depend entirely upon the

accuracy of the enrolling clerk and care of the enrolling committee.

"No rule of law is better established in this state than the rule to the effect that an enrolled bill is not conclusive of what bill was enacted. An enrolled bill may be impeached by an inspection of the original bill, indorsements thereon, journals, and other official records of the Legislature and official records in the office of the secretary of state. Arkansas State Fair Association v. Hodges, 120 Ark. 131, 178 S.W. 936, Ann.Cas.1917C, 829; Helena Water Co. v. City of Helena, [140 Ark. 597], 216 S.W. 26; Booe v. Road Imp. Dist. No. 4 [141 Ark. 140], 216 S.W. 500. If an enrolled bill signed by the President of the Senate and Speaker of the House is not conclusive and determinative of what bill was enacted by the General Assembly, no sound reason can be assigned why it should be conclusive and determinative of what bill the Governor approved; in other words, the additions, omissions, or misprisions contained in an enrolled bill should not bind the Governor to the letter of the copy by reason of his approval any more than the Senate and House whose President and Speaker signed it. In the case of Haney v. State, 34 Ark. 263, this court corrected a manifest and material error in an enrolled bill which had been signed by the President of the Senate and Speaker of the House and the Governor by inserting the word 'fourth' for the word 'fifth' so as to make the act conform to the intention of the Legislature in enacting, and the Governor in approving, it. The correction made to conform to the intention of the Legislature and Governor was material, because, unless made, the act was void. * * * By reference to the original bill published by the Legislature it is apparent that the enrolling clerk omitted to incorporate in the enrolled bill the paragraph in the original bill describing 19 sections of land traversed by the proposed road. The paragraph was in the original bill and rendered the district symmetrical in form. It is true the omission from the enrolled bill constituted a material discrepancy between the enrolled and the original bill, but nevertheless the omission was a clerical error, apparent from the face of the bill, and what should have been incorporated in the enrolled bill is ascertainable from an inspection of the original bill in the office of the secretary of state." See also Board of Control of Michigan State Prison v. Auditor General, 149 Mich. 386, 112 N.W. 1017; 59 C.J. 588.

However, to reach our decision on the first point raised by plaintiff, it is not necessary for us to resort to the original resolution and the journals and files of the legislature. The whole of the resolution as it appears in the 1943 and 1945 Laws, supra, shows that the omission of the words "state auditor" from Sec. 1 was obviously a clerical error, and under the applicable rules of construction and inter-

pretation we can determine the true meaning thereof and give effect thereto.

Digressing, we will consider plaintiff's contention, raised on oral argument, that the Resolution never legally passed the Senate because of the error in engrossing the same, in that under Sec. 9, Article III of the Constitution providing: "Each house when assembled shall * * * determine its own rules of proceeding,"

Senate Rule 17, reading as follows: "The Committee on Engrossment shall examine all bills, amendments and joint resolutions or other papers which are required to be engrossed, before they go out of the possession of the committee, and make a report when they find them correctly engrossed before they are read a third time; they shall also compare such amendments as may be made in the House to Senate bills and that are concurred in after they shall have been reengrossed in the Senate, for the purpose of seeing if they are correctly engrossed; and no bill shall have its third reading unless it has been printed, nor until it has been engrossed and report thereon made by the Committee on Engrossment that it has been correctly engrossed," and Rule 20, requiring that "Joint Resolutions shall be treated in all respects * * * in passage in a similar manner to bills * * *", should have and do have the force and effect of law.

▓▓▓ Plaintiff cites no authorities to support such proposition, and we do not accept it. The power of the legislative houses to make their own rules is for orderly procedure and the expedition and disposition of their business. A failure to comply with such rules does not jeopardize or invalidate resolutions or legislative acts. 59 C.J. 575. All that is required as to this constitutional amendment is contained in Article XX, Secs. 1 and 2, and a substantial compliance therewith is sufficient. Hays v. Hays, 5 Idaho 154, 47 P. 732.

▓▓▓ Returning now to the construction and interpretation of the Resolution, this Court has held that the general principles of statutory construction apply to the interpretation of constitutions (Phipps v. Boise Street Car Co., 61 Idaho 740, at page 747, 107 P.2d 148), and also to constitutional amendments. Idaho Mutual Benefit Ass'n v. Robison, 65 Idaho 793, at page 800, 154 P.2d 156, and numerous authorities therein cited. The same rules apply to resolutions proposing constitutional amendments.

▓▓▓ The cardinal principle of statutory construction is to save and not destroy. State v. Enking, 59 Idaho 321, at page 345, 82 P.2d 649; and it is incumbent upon a court to give a statute an interpretation which will not nullify it if such construction is reasonable or possible. Intermountain Title Guaranty Co. v. Egbert, 52 Idaho 402, at page 410, 16 P.2d 390; Northern P. R. Co. v. Shoshone County, 63 Idaho 36, at page 40, 116 P.2d 221; Bel v. Benewah County, 60 Idaho 791, at page 796, 97 P.2d 397.

438

All statutes must be liberally construed with a view to accomplishing their aims and purposes, and attaining substantial justice, and the courts are not limited to the mere letter of the law, but may look behind the letter to determine its purpose and effect, the object being to determine what the legislature intended, and to give effect to that intent. Hamilton v. Swendsen, 46 Idaho 175, at page 180, 267 P. 229, and cases therein cited. See also Northern P. R. Co. v. Shoshone County, 63 Idaho 36, at page 40, 116 P.2d 221; State v. Holder, 49 Idaho 514, at page 520, 290 P. 387.

"It is the duty of courts to execute laws according to their true intent and meaning; and that intent, when collected *from the whole and every part of the statute taken together,* must prevail even over the literal sense of the terms and control the strict letter of the law, when the letter would lead to possible injustice, contradiction, and absurdity. * * * In the construction of a statute it is an invariable rule to start out with the assumption that some effect is to be given, if possible, to every provision of the statute." (Emphasis added). Chandler v. Lee, 1 Idaho 349, at page 351.

" * * * It is not our business as a court to deal in any subtle refinements in construing legislative acts, but it is rather our duty to ascertain, if possible, *from a reading of the whole act* the purpose and intent of the Legislature and give force and effect thereto." (Emphasis added).

Swain v. Fritchman, 21 Idaho 783, at page 795, 125 P. 319, 323.

See also Lebrecht v. Union Indemnity Co., 53 Idaho 228, at page 234, 22 P.2d 1066, 89 A.L.R. 640, and Filer Highway Dist. in Twin Falls County v. Shearer, 54 Idaho 201, at page 209, 30 P.2d 199, for the rule that all sections of a statute should be considered and construed together to determine the true meaning thereof.

Obvious clerical errors or misprints will be corrected or words read in if the omission or error is plainly indicated and the true meaning is obvious, and the operation of the enactment would be otherwise defeated. State v. Enking, 59 Idaho 321, at page 346, 347, 82 P.2d 649; Frontier Milling & Elevator Co. v. Roy White Co. 25 Idaho 478, at page 485, 138 P. 825; Fletcher v. Gifford, 20 Idaho 18, 115 P. 824; State v. Mulkey, 6 Idaho 617, at page 620, 59 P. 17, 18, wherein the court said: " * * * As the clear intent of the act, considered as a whole, and especially of section 7, is apparent, that intention could not be defeated by a slight typographical error. It is the duty of courts, in construing and applying statutes that have been constitutionally enacted, to give force and effect to the will and intent of the legislature, and not to defeat that will and intent by giving force to trivial objection based solely on an immaterial typographical error." See also Speer v. Stephenson, 16 Idaho 707, at page 729, 102 P. 365; In re

Segregation of School Dist. No. 58, 34 Idaho 222, at page 229, 200 P. 138.

While a title is not required for a proposed constitutional amendment (Hays v. Hays, 5 Idaho 154, 47 P. 732), nevertheless, if one exists, it may be resorted to as an aid to construction. Fletcher v. Gifford, 20 Idaho 18, at pages 24 and 25, 115 P. 824; 12 C.J. 693; 16 C.J.S., Constitutional Law, § 523, p. 65; Townsend v. Smith, 144 Ga. 792, 87 S.E. 1039; State v. O'Connor, 81 Minn. 79, 83 N.W. 498; Collier v. Gray, 116 Fla. 845, 157 So. 40.

Fletcher v. Gifford, supra, involved the validity of an amendment to Sec. 1 of Article VIII of the State Constitution, the first part of which provided: "The legislature shall not in any manner create any debt or debts, liability or liabilities, which shall singly or in the aggregate, exclusive of the debt of the territory at the date of its admission as a state, exceed the sum of one and one-half per centum upon the assessed value of the taxable property in the state, etc."

A Resolution (H.J.R. No. 3, 1909 Laws, page 447) proposed an amendment to Article VIII, Sec. 1 of the Constitution, to permit the completion of the construction and furnishing of the State Capitol Building at Boise. The title of that resolution read:

"Joint Resolution

To amend section one of article eight of the constitution of the state of Idaho; and to submit to the electors of the state of Idaho for their rejection or approval an amendment to section one of article eight of the constitution of the state of Idaho to permit the legislature to authorize a bond issue sufficient to complete the construction and furnishing of the state capitol building at Boise, Idaho."

The proposed amendment as embodied in Sec. 1 of the Resolution, and as finally enrolled with the Secretary of State, omitted the word "not" and read in part, so far as applicable here, as follows:

"Section 1. That section one of article eight of the Constitution of the State of Idaho be amended to read as follows:

"Section 1. The Legislature shall in any manner create any debt or debts, liability or liabilities, which shall singly or in the aggregate, exclusive of the debt of the Territory at the date of its admission as a State, and exclusive of debts or liabilities incurred subsequent to January 1st, 1911, for the purpose of completing the construction and furnishing of the State Capitol Building at Boise, Idaho, exceed the sum of one and one-half per centum upon the assessed value of the taxable property in the State, except * * *".

Section 2 of that Resolution provided: "The question to be submitted to the electors of the State of Idaho at the next general election shall be as follows, to-wit: 'Shall Section one of article eight of the Con-

440

stitution of the State of Idaho be amended so as to permit the Legislature to authorize a sufficient bond issue or make a sufficient appropriation to complete the construction and furnishing of State Capitol Building at Boise, Idaho?'"

The court said, 20 Idaho, page 24, 115 P. page 826:

"* * * Now, it is apparent from the title to the resolution, and also from section 2 thereof, which provided the manner and form of the submission to the people, that the only purpose of the amendment was to exclude from the debt limitation of this section of the Constitution such debts or liabilities as might necessarily be incurred subsequent to the 1st day of January, 1911, 'for the purpose of completing the construction and furnishing of the State Capitol building.' If, however, we should read this section as amended with the 'not' omitted from the first line, we would see at once that the amendment removes all debt limitation absolutely."

"* * * Neither the title to the resolution nor the question submitted to the people indicated any purpose of removing the debt limitation from the Constitution. It is perfectly clear that the word 'not,' as it appeared in the section before the amendment, was omitted from the amendment by error, oversight, or inadvertence in course of printing, engrossing, or enrolling the bill; and it appears equally clear and satisfactory to us that the Legislature submitted the amendment on the theory that it still retained the debt limitation, and that the word 'not' was contained in the amendment, and that the amendment as adopted should be read and construed in that light. No proposition was submitted to the people to remove the debt limitation from the Constitution, and they had no opportunity of voting on that question except by rejecting the entire amendment."

The court, faced with upholding the amendment by correcting the error or declaring it invalid by reason of the omission, went on to say, 20 Idaho page 26, 115 P. page 826:

"We are not unmindful of the general rule applicable in construing amended statutes, namely, that, where words have been omitted from the amendment that were contained in the section intended to be amended, the lawmaking body will be presumed to have deliberately and intentionally omitted such words. This rule, however, must be applied in the light of other well-recognized rules, one of which is that where a statute is apparently contradictory in its parts, or a literal reading would render it contradictory, it must be so construed in the light of the purposes and objects to be accomplished and the manifest intent of the lawmaking body as to reconcile the several provisions, and give the whole a practical and sensible effect. *Here the title to the resolution, the section providing for the submission, the additional language actually inserted in the section by way of amendment, and the context and attending*

*indications all lead to the inevitable conclusion that the amendment was treated and considered and understood by both the Legislature in submitting it and the people in adopting as if the word 'not' was contained in the first line immediately following the word 'shall,' and, to so read it, gives effect to all its parts, and renders it harmonious and intelligible.*" (Emphasis added).

and then quoted with approval from Haney v. State, 34 Ark. 263, as follows, 20 Idaho page 28, 115 P. page 827: " 'It is very true, as a general rule of construction that, where the language of an act is plain and unambiguous, the courts must give it effect, as it stands, or declare the law unconstitutional. But this rule is subject to much qualification, and does not apply to cases of plain clerical errors, where it is obvious that the Legislature *did not intend* to use the word as written, and it is further apparent what word they *did* intend. A mistake of this nature may be corrected by the courts, upon as sound principle as a mistake in a deed. It is not judicial legislation, nor judicial interference with the legislative will. It is in support of the legislative will, and wholly distinct from the reprehensible practice of warping legislation, to suit the views of the courts as to correct policy. The only conditions to be observed in the exercise of this power of literal correction are that the courts should be thoroughly and honestly satisfied of the legislative intent, irrespective of the policy of the act.' "

and concluded with this language: "From what has been said, we conclude that the amendment is valid and operative, and that it was the intention of the Legislature in submitting it and of the people in voting to adopt it that it should retain the debt limitation and should read, 'The Legislature shall not in any manner create any debt,' etc., and that authority should be conferred on the Legislature to issue bonds sufficient to complete and furnish the State Capitol building."

In State v. Enking, supra, 59 Idaho 321, 82 P.2d 649, 660, this court had before it the validity of Chap. 252, 1937 Laws, relating to the Idaho fruit and vegetable industry. The statute created the Fruit and Vegetable Advertising Commission, levied taxes on fruits and vegetables produced in Idaho, and contained the following provision for the state treasurer to issue warrants for salaries and expenses: " * * * Vouchers shall be submitted by the Commission to the State Auditor and upon approval by the State Board of Examiners he shall forthwith submit such vouchers to the Treasurer for issue of warrants thereon."

The court said, 59 Idaho page 346, 82 P. 2d 66:

"It must be conceded that if we hold the Legislature intended to make it the duty of the state treasurer to draw all warrants on the Fruit and Vegetable Advertising and Development Fund, then, that the

state treasurer would both draw and pay warrants, with the result that the checks and balances established some 72 years ago, and ever since maintained, would be abolished so far as the drawing of warrants on that fund is concerned. Did the Legislature intend, in this single instance, to abolish the checks and balances which have stood the test of nearly three-quarters of a century, and proven entirely satisfactory? * * * Is it not more reasonable, then, to take the view that the Legislature intended to use the word 'auditor' instead of the word 'treasurer', and that the use of the word 'treasurer' was simply a clerical error which, if permitted to stand, would make the provision an absolute absurdity? A similar situation was presented to this court in Frontier Mill., etc., Co. v. Roy White, etc., Co., 25 Idaho 478, 485, 138 P. 825, where it was said (page 827):

" 'From reading the above amendment it is apparent that the word "of" was inserted in the act on the third line in lieu of the word "or." The insertion of the word "of" was evidently a clerical error, and no doubt the act was clearly intended by the Legislature to read as follows: "Any person, firm or corporation, superintendent or trustees, or any board of directors of any firm or corporation," etc.

" 'To hold otherwise that portion of the section of the statute just referred to would convey no meaning, and would be an absolute absurdity. We think the rule is well stated in Black on Interpretation of Laws, pp. 151 and 157, that: "The use of inapt, inaccurate, or improper terms or phrases in a statute will not defeat the act, provided the real meaning of the Legislature can be gathered from the context or from the general purpose and tenor of the enactment. In such cases, the words in question will be interpreted according to that meaning which the Legislature actually intended to express, although this may involve a departure from the literal signification." ' "

" ' "Clerical errors or misprints, which, if not corrected, would render the statute unmeaning or nonsensical, or would defeat or impair its intended operation, will not vitiate the act; they will be corrected by the court and the statute read as amended, provided the true reading is obvious, and the real meaning of the Legislature is apparent on the face of the whole enactment." The word "and" in a statute may be read "or" and vice versa, whenever the change is necessary to give the statute sense and effect, or harmonize its different parts, or carry out the evident intention of the Legislature. We think we are clearly within the rule in our construction of the above statute as far as this question is concerned.' See, also, Speer v. Stephenson, 16 Idaho 707, 102 P. 365, and Washington Fire Co. [No. 7, of City of Wilmington, Delaware] v. Yates, 13 Del. Ch. 32, 115 A. 365.

"Aside from the fact that the Legislature used the word 'treasurer', in that part

of section 13 above-quoted, instead of the word 'auditor', there is not the slightest hint anywhere in the statute that the Legislature intended to abolish existing wholesome checks and balances, and introduces the exceedingly strange and senseless innovation that the state treasurer should draw warrants on herself. Surely the legislature could not have intended to enact such a choice bit of freak legislation." (Emphasis added.)

In Smallwood v. Jeter, 42 Idaho 169, 244 P. 149, 151, the validity of Chap. 197, 1925 Laws, relating to auto transportation companies was in question. Section 3 of the Act, if read literally, exempted all vehicles equipped to transport less than 12 passengers from obtaining insurance, and made a class by itself of vehicles equipped to carry exactly 20 passengers. The statute provided: " * * * not less than $10,000.00 for recovery for personal injury suffered by all persons injured while being transported in each such vehicle equipped to carry *not less than twelve passengers,* not less than $15,000.00 for personal injury suffered by all persons injured while being transported in each such vehicle equipped to carry *not less than twenty passengers,* and not less than $20,-000.00 for recovery for personal injury suffered by all persons injured while being transported in each such vehicle equipped to carry more than twenty passengers; * * *" (Italics ours).

The court there held that, by reference to the title and body of the act, all transportation companies were included, and it was plainly not the intent or purpose of the legislature to exempt therefrom vehicles equipped to carry less than 12 passengers, or to make a single class of vehicles equipped to carry exactly 20 passengers. The court said:

"Plaintiff contends that the insurance feature of the act is void because unintelligible, and that it 'cannot be corrected by the addition or omission of words.' We are entitled to, and must, look to the intention of the Legislature as gathered from the whole act, and when a literal reading of a provision will work an unreasonable or absurd result, if a reasonable intent of the Legislature can be arrived at, the court should so construe the act as to arrive at such intention rather than an absurdity. To accomplish this purpose, words may be changed, not to legislate, but to arrive at what the Legislature intended to enact. 'Especially will this be done when it is necessary to prevent a law from becoming a nullity.' 25 R.C.L., pp. 975, 976, § 225."

" * * * Giving the whole act its reasonable construction, and changing the phrase 'not less than twelve passengers' to read 'not more than twelve passengers,' and the phrase 'not less than twenty passengers' to read 'not more than twenty passengers,' arrives at a graduated limit of insurance or bond to be carried on each class of vehicles. which is sensible and appears

to have been the intention of the Legislature."

Plaintiff cites State ex rel. Kinyon v. Enking, 62 Idaho 649, 115 P.2d 97, as holding that the language of the amendment will not be rewritten by this court. That case, however, it not at all similar to the one at bar. It involved the omission of the word "state" from the enumeration of securities that might be accepted in loaning permanent endowment funds other than funds arising from the disposition of university land. Sec. 11, Article IX of the Constitution, as originally adopted, provided in part: "The permanent educational funds, other than funds arising from the disposition of university lands belonging to the state, shall be loaned on first mortgage on improved farm lands within the state, or on state or United States bonds, * * *"

The 1928 amendment omitted the latter word "state" and read as follows: "The permanent educational funds other than funds arising from the disposition of university lands belonging to the state, shall be loaned on first mortgage on improved farm lands within the state, United States, county, city, village or school district bonds, or state warrants, * * *"

Said amendment was never questioned, and a further amendment submitted in 1939 was adopted in 1940, by which the right to loan on first mortgages on improved farm lands was excluded. This amendment also omitted State bonds from the list of acceptable securities.

The amendment as proposed in S.J.R. No. 5, 1939 Laws, page 670, omitted "State bonds" from the title and from Section 1, proposing the amendment, and also from the question submitted, which was: "Shall Section 11 of Article 9 of the Constitution of the State of Idaho be amended to provide that the permanent endowment funds other than funds arising from the disposition of university lands belonging to the state, shall be loaned on United States, county, city, village or school district bonds, or state warrants under such regulations as the legislature may provide?"

Thus, in the Enking case, there was no discrepancy between the title, the proposal and the question, and the court held the legislature could reasonably have intended to exclude state bonds for various reasons.

Lane v. Lukens, 48 Idaho 517, 283 P. 532, 553, relied on by plaintiff, is also distinguishable. The question there was not, as here, submitted to the people to be voted on in the identical language that the Constitution would have if amended. The first section of the resolution in the Lukens case contained a draft of the constitutional provision as it would read as amended, and after enumerating the constitutional officers, provided: " * * * each of whom shall hold this office for four years beginning on the first Monday in January next after his election * * *"

The question for submission, as set forth in the resolution, simply provided: "Shall section 1 of article IV of the Constitution

be amended to provide that the term of office of Governor, Lieutenant Governor, Secretary of State, State Auditor, State Treasurer, Attorney General and Superintendent of Public Instruction shall be limited to four years?"

As the court pointed out, there was a "fundamental antagonism" between the amendment and the question, because the word "limit" under the question submitted meant the officer could not hold office beyond four years, whereas the proposed amendment contained no such provision express or implied.

In McBee v. Brady, 15 Idaho 761, 100 P. 97, one of the several propositions contained in the amendment was not included in the question and the electors had no opportunity to ballot thereon.

In the case at bar, the omission of the words "state auditor" from Sec. 1 of the Resolution as hereinbefore pointed out, was merely a clerical error. The title, and the question proposed for submission and as submitted, contained these words and the reading of the entire resolution plainly discloses an intent to retain such officer as a constitutional officer, and no intent to abolish him as such. The question as set forth in Sec. 2 of the Resolution, and as submitted, containing as it did the exact language that the Constitution would have as amended, was an integral part of the Resolution. There is no question as to what was intended by the plain language of Sec. 2, which can be considered as important as Sec. 1, or more so. The people amend the constitution, and the question submitted is controlling so far as the electors are concerned. Lane v. Lukens, supra. The ballot, with the question thereon, put to the voter is the machinery with which he comes in direct contact and by which he acts. It must be borne in mind that in Lane v. Lukens and McBee v. Brady, supra, the question submitted to the voters was an abstract of the proposal and actually not, as is true here, the proposal itself.

Plaintiff has incidentally argued that the publication of the Resolution in full, with the omission in Sec. 1, rendered the proposed amendment unfree from confusion and uncertainty to the voters. As hereinbefore pointed out, the ballot with the question thereon is what the voter comes directly in contact with. He presumably reads the question, and it is natural to assume that the question as worded is controlling with him. The question itself should, as it is here, be free of uncertainty and confusion. While it has been said in Mundell v. Swedlund, supra, 58 Idaho at page 230, 71 P.2d at page 444, that the publication of the amendment was to fully advise the voters as to the natural scope and effect of the proposed amendment, nevertheless we cannot say that there has been any doubt or confusion in the publication, or that any could arise from a reading of the entire amendment. The only doubt that might arise would be whether it was intended to abolish the state auditor as a

446

constitutional officer, and this is too remote to permit any reasonable inference thereof. Further, plaintiff's petition contains nothing to show that the electors were in any way deceived or misled by the publication.

■ Since the omission was a clerical error, we conclude, in the light of the above cases, particularly Fletcher v. Gifford, that it was intended by the legislature in submiting this amendment, and by the people in voting to adopt it, to include the words "state auditor" throughout, and that Sec. 1 of the Resolution should so read, and that the amendment as to this first contention of the plaintiff is valid and operative, and that there was no difference in the amendment as proposed and as voted on and ratified by the electors.

Plaintiff next contends that the proposal violated Article XX, Sec. 2, of our Constitution, which provides: "If two or more amendments are proposed, they shall be submitted in such manner that the electors shall vote for or against each of them separately," in that it contained four distinct amendments, none of which depend on the other:

(1) Increasing the term of each constitutional state officer from two to four years;

(2) Permitting residence of six of these officers outside Boise, but within Ada County;

(3) Providing the Governor shall not succeed himself;

(4) Providing the Governor shall be eligible for that office after expiration of one full term; and claims the test to be applied under this provision is: "Can the change or changes proposed be divided into subjects distinct and independent and can any one of them be adopted without in any way being controlled, modified or qualified by the other. If not (so) then there are as many amendments as there are distinct and independent subjects, and it matters not whether the proposed change affects one or many sections or articles of the Constitution," citing McBee v. Brady, 15 Idaho 761, 100 P. 97.

First, let us consider the object of the foregoing constitutional provision and similar ones in other states:

"This provision of the Constitution is a wise one, and is intended to prevent several inconsistent and conflicting propositions from being submitted to the voters in the same amendment, and forcing the voter to approve or reject such amendment as a whole."

" * * * It was evidently the intention by this provision to require that propositions which were incongruous, or which did not relate to the same subject-matter or have the same object and purpose, should be considered as separate amendments." McBee v. Brady, supra, 15 Idaho at pages 772 and 779, 100 P. at page 101.

" * * * There is no doubt that the constitutional provision above quoted was intended to prevent the pernicious practice

of 'logrolling' in the submission of a constitutional amendment." Kerby v. Luhrs, 44 Ariz. 208, 36 P.2d 549, 551, 94 A.L.R. 1502.

"The convention which required each amendment to be separately submitted also ordained that no act of the legislature should contain more than one subject, and that subject should be clearly expressed in the title. The same common purpose actuated the convention in placing these two provisions in the constitution. 'It was intended to kill logrolling, and prevent unscrupulous, designing men, and interested parties, from dexterously inserting matters in the body of a bill of which the title gave no intimation of the true character, or of comprising subjects diverse and antagonistic in their nature, in order to combine in its support members who were in favor of a particular measure.' State v. Miller, 45 Mo. [495], 498." Gabbert v. Chicago, R. I. & P. Ry. Co., 171 Mo. 84, 70 S.W. 891, at page 897.

"Such a constitutional provision is designed to prevent the submission to the voters, as one amendment, of distinct propositions that are so far disconnected and independent of each other as to have no direct relation to a general subject. The vice it is designed to prevent is analogous to the log-rolling and joker practices which are so familiar to students of legislation, and which are generally sought to be prevented by constitutional provisions requiring an expression of the subject of legislation in the title of the bill, and that the legislation shall concern but a single subject." State v. Wetz, 40 N.D. 299, 168 N. W. 835, 847, 5 A.L.R. 731, at page 752.

The question of determining what constitutes two or more amendments within the purview of a constitutional provision similar to Sec. 2, Article XX of our Constitution has given much difficulty to the courts, and the application of such provision has not been an easy one.

In State v. Timme, 54 Wis. 318, 11 N.W. 785, 790, a leading and frequently cited case, the court said:

"This provision can have but two constructions: First, it may be construed as is contended for by the learned counsel who contends that the amendment under controversy was not properly submitted, that every proposition in the shape of an amendment to the constitution, which standing alone changes or abolishes any of its present provisions, or adds any new provision thereto, shall be so drawn that it can be submitted separately, and must be so submitted. Such a construction would, we think, be so narrow as to render it practically impossible to amend the constitution; or, if not practically impossible, it would compel the submission of an amendment which, although having but one object in view, might consist of considerable detail, and each separate provision, though all promotive of the same object and necessary to the perfection and practical usefulness thereof, if adopted as a whole, in such form that a defeat of

one of its important matters of detail might destroy the usefulness of all the other provisions when adopted. Take the case as presented by the amendment under consideration. The learned counsel admits that the proposition to change from annual to biennial sessions is so intimately connected with the proposition to change the tenure of office of members of the assembly from one year to two years, that the propriety of the two changes taking place, or that neither should take place, is so apparent that to provide otherwise would be absurd. And yet it is insisted that the two changes are two separate amendments within the meaning of the constitutional provision above quoted, and must be submitted separately. If they must be submitted separately, why must they? Certainly they should either both be defeated or both adopted. Why, then, should the people be permitted or compelled to vote upon each separately? Certainly no good could result from a separate submission which is not equally as well and better accomplished by submitting them together as one amendment; and the separate submission might result in the absurdity of the ratification of the one and the rejection of the other. This illustration is, to my mind, almost conclusive that no such intention was entertained either by the framers of the constitution or by the people who adopted it.

"We think amendments to the constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. In order to constitute more than one amendment, the proposition submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. * * * We do not contend that the legislature, if it had seen fit, might not have adopted these changes as separate amendments, and have submitted them to the people as such; *but we think, under the constitution, the legislature has a discretion, within the limits above suggested, of determining what shall be submitted as a single amendment, and they are not compelled to submit, as separate amendments, the separate propositions necessary to accomplish a single purpose.*" (Emphasis added).

In State v. Herried, 10 S.D. 109, 72 N. W. 93, at page 97, the South Dakota Court said: "It is contended with much apparent reason that two distinct objects were intended, namely, the abolition of the trustees, and a change in the number and powers of the regents; that these objects are independent of each other; that either might have been adopted without adopting the other; and that there are numerous reasons why an elector might have desired one change, and not the other. The defect in this argument consists in substituting for the real object or purpose one of its incidents. Control of the state educational institutions is the subject to which the pro-

posed amendment relates. Its purpose or object is to place such institutions under the control of a single board. The membership of such board, its powers, and the abolition of the local boards, are but incidental to and necessarily connected with the object intended. Hence we conclude that only one amendment was submitted. *It must be conceded that courts and lawyers may easily differ regarding the result reached herein. The question is involved in serious doubt. Such being the situation, the court invokes the well-recognized rule, applicable here, as in cases where the constitutionality of statutes is brought in question, and sustains the amendment, because it does not plainly and palpably appear to be invalid.*" (Emphasis added).

The Missouri Court has said in Moore v. Brown, 350 Mo. 256, 165 S.W.2d 657, at page 662: "The general rule is that one constitutional amendment may change several articles or sections of a Constitution if all these changes are germane to a single controlling purpose. In such case it does not contain two amendments or two subjects, and cannot be said to violate Sec. 2, Art. XV for that reason. 12 C.J. #26, p. 691; 16 C.J.S., Constitutional Law, § 9, page 44; 11 Am.Jur. #31, p. 635; Gabbert v. Chicago, R. I. & P. Ry. Co., 171 Mo. 84, 101, 105, 70 S.W. 891, 897."

In State v. Wetz, supra, the North Dakota Court said: "As to what constitutes a plurality of amendments within a provision such as our section 202, however, the attitude of the courts generally has been to adopt what is, in our judgment, properly termed a liberal and common-sense view."

The Supreme Court of Washington in Gottstein v. Lister, 88 Wash. 462, 153 P. 595, at page 598, Ann.Cas.1917D, 1008, said: "Now, since the Constitution does not in terms prescribe what shall be regarded as one amendment for the purpose of enabling the electors to vote thereon separately, the question is manifestly to be answered by a consideration of the inherent nature of any given proposed amendment. The logic of counsel's contentions would seem to lead to such a minute subdivision of matters liable to become the subject of constitutional amendment as to practically refine out of existence the power of the people to amend the Constitution. Almost any conceivable amendment to the Constitution is capable of being subdivided into separate propositions of such nature that an elector might consistently favor the adoption of some and the rejection of others. *As we proceed, we think it will be found that the singleness of a given proposition beyond division is not the ultimate test, but that the question must be viewed in a broader aspect as one largely of common sense, and in a spirit of deference to the discretion of the Legislature, much as we defer to legislative discretion in restricting a bill to one subject* and expressing such subject in the title thereof, as required by section 19, art. 2 of the Constitution, though possibly the lati-

tude of the Legislature is hardly so broad in determining what constitutes one amendment to the Constitution." (Emphasis added).

Likewise, the Supreme Court of Montana, in State v. Alderson, 49 Mont. 387, 142 P. 210; at page 213, Ann.Cas.1916B, 39, has said: "If, in the light of common sense, the propositions have to do with different subjects, if they are so essentially unrelated that their association is artificial, they are not one; but if they may be logically viewed as parts or aspects of a single plan, then the constitutional requirement is met in their submission as one amendment. * * * The unity of subject implicitly required by the provision in question does not essentially differ from the unity of subject required by section 23, art. 5, of the Constitution, concerning acts of the legislative assembly. * * * We have repeatedly held that the unity required by this section is served notwithstanding the existence of many provisions is an act where such provisions are germane to the general subject expressed."

See also Annotation on the subject in 94 A.L.R. 1510, 1511: "Questions frequently arise under such provisions as to whether particular amendments embrace more than one subject or whether the entire amendment is germane to a single general subject, and the rule has been laid down that a constitutional amendment embracing several subjects, all of which are germane to the general subject of the amendment, will, under such a requirement, be upheld as valid, and may be submitted to the people as a general proposition. 6 R.C.L. 30."

In Mundell v. Swedlund, 58 Idaho 209, 71 P.2d 434, wherein the contention was made that the amendment of Sec. 9, Article V of the Constitution, providing for appeals from orders of the Industrial Accident Board directly to the Supreme Court and the Court on such appeals should be limited to a review of questions of law, was duplicitous within the purview of Sec. 2, Article XX of our Constitution, the court said, 58 Idaho page 224, 71 P.2d page 441:

"It is reasonable to hold, and the principle seems to be well settled, that where the question submitted to the people for vote involves an amendment or change in the Constitution, even though it may contain what appears to be several or different questions, nevertheless, if they cannot be so intelligently divided that, when submitted separately, any one might be approved and all the others rejected, and when so approved become effective and operative, then they should be submitted as one amendment; otherwise they should be submitted as separate amendments. In other words, if a proposed amendment, when divided up into two or more amendments, reduces the questions to such form that the voters might reject the main or controlling question and adopt the collateral or subordinate amendment or amendments, and thus leave the amendment or amendments so adopted useless or inoperative, or so incon-

gruous as to upset or impair an existing system, then of course it follows that the whole matter should be submitted as one amendment. * * *

*"It seems reasonable to assume that the inquiry as to the oneness of the question or subject-matter submitted by a proposed amendment should be determined in the same manner and by the same rule and course of reasoning by which the sufficiency of the title of an act of the Legislature is determined, under section 16, art. 3 of the Constitution, which provides that: 'Every act shall embrace but one subject and matters properly connected therewith,* which subject shall be expressed in the title,' etc. This course of reasoning was adopted in Gabbert v. Chicago, etc., Ry. Co., 171 Mo. 84, 70 S.W. 891, which case was cited with approval in McBee v. Brady, 15 Idaho 761, at pages 777, 781, 100 P. 97, 103. It is true that a resolution proposing a constitutional amendment is not 'a formal "act" or statute' and does not require a title (Hays v. Hays, 5 Idaho 154, 159, 47 P. 732); but the same reason ought to exist for determining the singleness of subject embraced in a legislative act as in determining whether more than one subject and essentially related matter is embodied in a single amendment. * * *

"The futility and danger as well of attempting to divide up a proposed amendment dealing with a substantial constitutional change, together with the necessary and essential subsidiary matters requisite to its successful operation or enforcement and the accomplishment of its purpose, is illustrated by the number of parts into which the attorney general has divided this amendment." (Emphasis added.)

The court concluding as a general proposition as was done in the case of McBee v. Brady, supra, that: " * * * if the thing or things proposed can be divided into *questions distinct and independent* so that any one of them can be adopted without *in any way* being *controlled, modified, or qualified* by the other, then there are as many amendments as there are distinct and independent questions or subjects." (Emphasis added.)

upheld the amendment because of the relation of the two changes involved.

The object of Sec. 16, Article III of our Constitution (referred to in Mundell v. Swedlund, supra) is similar to the object of Sec. 2, Article XX.

In Pioneer Irr. Dist. v. Bradley, 8 Idaho 310, at page 317, 68 P. 295, 297, 101 Am. St.Rep. 201, this court, speaking of Sec. 16, Article III, said:

"The object and purpose of said constitutional provision is well understood. It was to prohibit the practice of bringing together into one bill subjects diverse in their nature, and having no necessary connection; to prohibit 'hodgepodge,' or 'logrolling' legislation. Cooley Const.Lim. P. 172. It was to avoid improper influences which may result from an intermingling in one

and the same bill such things as have no proper relation to each other.

" * * * In State v. Ranson, 73 Mo. 78, it is stated that said provision is to prevent conjoining, in the same bill, incongruous matter, and subjects having no legitimate connection, or relation to each other, and in no way germane to the subject expressed in the title."

The Court went on to quote with approval from State v. Board of Com'rs, 21 Nev. 235, 29 P. 974, 975, as follows: " 'This, then, being the mischief against which this clause of the constitution is directed, it should be so construed as to correct the evil, but at the same time not to needlessly thwart honest efforts at legislation. There is scarcely any subject of legislation that cannot be divided and subdivided into various heads, each of which might be made the basis of a separate act, and in which the connection between them may be made a matter of controversy. * * * If the provisions of a statute all relate, directly or indirectly, to the same subject, have a natural connection, and are not foreign to the subject expressed in the title, it is permissible to unite them in the same act. * * * The objections should be grave, and the conflict between the constitution and statute palpable, before the judiciary should disregard a legislative enactment upon the sole ground that it embraces more than one object."

and from People v. Parks, 58 Cal. 624: " 'Provisions of an act may be numerous; but however numerous, if they can be, by fair intendment, considered as falling within the subject matter of legislation, or necessary as ends and means to the attainment of the subject, the act will not conflict with the constitution.' "

See also State of Idaho v. Pioneer Nurseries Co., 26 Idaho 332, 143 P. 405.

Discussing the principles applicable in determining whether a statute violates the requirement that it embrace but one subject and matters properly connected therewith, this Court in Boise City v. Baxter, 41 Idaho 368, at page 375, 238 P. 1029, 1032, said:

"In Pioneer Irr. Dist. v. Bradley, supra, it is stated that if the title of an act indicates, and the act itself actually embraces two or more subjects diverse in their nature, that have no necessary connection, such act is unconstitutional and void. However, in the further discussion of the question, the court states the correct principle of law applicable to this class of cases, and makes it clear that a single act may embrace many subjects and not be duplicitous, if they pertain to matters that are properly connected with the subject of the act. It is said that if the provisions of an act all relate directly or indirectly to the same subject, having a natural connection therewith, and are not foreign to the subject expressed in the title, they may be united in one act; that however numerous the provisions of an act may be, if they can be by fair intendment considered as falling within

the subject-matter legislated upon in such act, or necessary as ends and means to the attainment of such subject, the act will not be in conflict with this constitutional provision; that if an act has but one general subject, object, or purpose, and all of its provisions are germane to the general subject and have a necessary connection therewith, it is not in violation of this constitutional provision; that said provision was not intended to prevent the incorporation into a single act of the entire statutory law upon one general subject. We think this is a correct exposition of the purpose, meaning, and rules for the application of this constitutional provision.

" * * * The term 'subject,' as used in the Constitution, is to be given a broad and extended meaning, so as to allow the Legislature full scope to include in one act all matter having a logical or natural connection. *To constitute duplicity of subject, an act must embrace two or more dissimilar and discordant subjects that by no fair intendment can be considered as having any legitimate connection with or relation to each other.* All that is necessary is that the act shall embrace some one general idea, and its parts be so connected with and relate to each other, either logically or in popular understanding, as to be parts of and germane to one general subject." (Emphasis added.)

The Supreme Court of the United States has said: "The Supreme Court of Idaho has laid down the proper rule in Pioneer Irr. Dist. v. Bradley, 8 Idaho 310, 68 P. 295, 101 Am.St. 201, to the effect that the purpose of the constitutional provision is to prevent the inclusion in the title and act of two or more subjects diverse in their nature and having no necessary connection; but that if the provisions relate directly or indirectly to the same subject, have a natural connection therewith, and are not foreign to the subject expressed in the title, they may be united." Utah Power & Light Co. v. Pfost, 286 U.S. 165, 52 S.Ct. 548, 554, 76 L.Ed. 1038, 1050.

Turning now to the question here presented, the framers of our Constitution saw fit to provide in a single section of Article IV, as logical and related parts of the general subject of executive state officers, the following:

(a) The naming and enumeration of such officers;

(b) Their terms and tenure of office;

(c) Their residence during their terms and tenure of office;

(d) Their duties.

The amendment here does not go outside or beyond any of these matters. It is on the same plan with modifications of certain parts of the original set-up. The main or controlling change or question is the four year term for executive state officials. The proviso that the governor shall not succeed himself, except for being eligible to hold the office after a lapse of one full term, is directly, properly and reason-

ably related to the matter of terms and tenure of such officials, and is incidental and subordinate to the main or controlling question. All parts of the amendment bear some relation to the subject of executive state officers and are properly connected therewith.

Further, under the constitutional requirement as to unity of legislative acts mentioned in Mundell v. Swedlund, supra, as furnishing a test for duplicity of amendments to the Constitution, the entire amendment here can likewise be said to embrace but one subject and matters properly connected therewith.

The test for duplicity in a constitutional amendment, when viewed in the light of cases on the subject, is not that the matters contained therein might be divided and submitted in separate questions, but that they are incongruous and essentially unrelated.

It is difficult to imagine how a proposed amendment could be drawn by the legislature to get the exact wording the Constitution would have as amended by the people, if four questions had to be submitted here as contended for by plaintiff, unless all carried at one election. The practical effect would be to render it extremely difficult, if not impossible, to ever amend the Constitution unless each particular change were proposed and submitted at different succeeding elections.

What constitutes related matters is for the legislature to determine in the first instance when it proposes an amendment, and if there is any reasonable basis or theory upon which such determination is founded, and the same is not arbitrary or capricious, its judgment in that regard should be respected. As was said in Hillman v. Stockett, 183 Md. 641, 39 A.2d 803, at page 808: "The Legislature was empowered in the first instance to determine what changes it considered advisable and to put these changes in one bill, this whether they were all in one section of the Constitution or whether they were in several sections, or whether they were not in the Constitution at all, and new sections had to be added. We cannot assume that the Legislature would propose an amendment, which might contain matters obviously not related, but if it did, then the Courts would have power to pass upon the proposal and to determine whether or not Article XIV had been followed. In the absence of a clear violation, the judgment of the Legislature as to what is related and what is not related should be respected, and the Courts should not interfere." See also State v. Timme, supra, 54 Wis. 318, 11 N. W. 785.

The matters contained in the amendment being sufficiently related, we hold that there was no violation of Sec. 2, Article XX of the Constitution in the submission thereof. In arriving at this conclusion, we are not unmindful of McBee v. Brady, supra, which counsel for plaintiff strenuously

argue controls this case. One great difference between that case and this one, is that here only one section of the Constitution covering related matters was proposed to be amended, whereas in the former some four different sections of Article V and one section of Article XVIII were proposed to be amended, and at the same time, two sections of Article V repealed. By reason of the numerous sections involved and the method of proposing and submitting them, the Court was faced with a difficult decision. That case must stand upon its own facts, particularly when the question there submitted did not contain all the proposed changes. We are not prepared to say that case is erroneous under Sec. 2 of Article XX, since, by reason of the numerous sections of the Constitution involved, it can reasonably be said that more than one amendment was submitted.

Nor is it necessary to change or modify the following language set forth in McBee v. Brady, and in effect reiterated in Mundell v. Swedlund, supra: "* * * The determination whether a proposed change in the Constitution constitutes one or more amendments, it seems to us, depends upon whether the change as proposed relates to one subject and accomplishes a single purpose, and the true test should be, can the change or changes proposed be divided into subjects distinct and independent, and can any one of which be adopted *without in any way being controlled, modified, or qualified by the other."* (Emphasis added).

Such must be read in the light of the other language of these cases, a part of which has been hereinabove set forth. It is to be noted that the language just quoted makes it requisite for separate voting thereon, that the changes can be divided into *distinct* and *independent* subjects, and also that any one of them can be adopted *without in any way being controlled, modified or qualified by the other.*

In our opinion, the amendment proposed here, while it might be arbitrarily divided, cannot be separated into distinct and independent subjects, and the various provisions are not absolutely free of any control, modification or qualification of the others.

The final contention of the plaintiff is that the amendment, although adopted, does not actually provide for a four year term, for the reason that the words "except as otherwise provided in this constitution," therein, make Sec. 2 of Article IV, reading in part: "The officers named in section 1 of this article shall be elected by the qualified electors of the state at the time and places of voting for members of the legislature, * * *" controlling, and if not controlling, the provisions of Sec. 1 as amended and Sec. 2 are conflicting.

Sec. 1 has nothing to do with times and places of election of state officers. It provides that each of the executive officers shall "hold his office for four years beginning on the first Monday in January next after the election, commencing with those elected in the year 1946, except as other-

wise provided in this Constitution." The exception, therefore, refers to tenure, not election. If the framers of the Constitution had intended to make Sec. 2 controlling, it seems natural that they would have omitted the words "two years" from Sec. 1 of Article IV as originally framed.

We do not now have a change in or conflict with Sec. 2 of Article IV, but only a changed application of this section. In other words, although the executive officers have four year terms they will still be elected at those elections when members of the legislature are voted for, though not at every such election. We see no repugnancy in the operation of Sec. 1 as amended and Sec. 2. Sec. 2 is a general one, while Sec. 1 is more specific. In Swanson v. State, 132 Neb. 82, 271 N.W. 264, at page 271, it was said:

"The following statement of the rule under discussion has received approval in this jurisdiction: 'A constitutional amendment becomes an integral part of the instrument and must be so construed. It must be harmonized, if possible, with all other provisions, and effect must be given to every section and clause as well as the whole instrument.' Luikart v. Higgins, 130 Neb. 395, 264 N.W. 903. See, also, Hooper Telephone Co. v. Nebraska Telephone Co., 96 Neb. 245, 147 N.W. 674.

"It will also be remembered that, while a clause in a constitutional amendment will prevail over a provision in the original instrument inconsistent with the amendment, 'distinct constitutional provisions are repugnant to each other only when they relate to the same subject, are adopted for the same purpose, and cannot be enforced without substantial conflict.' 12 C.J. 709.

"So, also, it is a well-recognized canon of construction that, 'when general and special provisions of a Constitution are in conflict, the special provisions should be given effect to the extent of their scope, leaving the general provisions to control in cases where the special provisions do not apply.' 12 C.J. 709."

and in Sylvester v. Tindall, 154 Fla. 663, 18 So.2d 892, at page 900, it has been also said:

"A general rule is that no one provision of the constitution is to be separated from all the others, to be considered alone, but that all provisions bearing upon a particular subject are to be brought into view and to be so interpreted as to effectuate the great purposes of the instrument. Thus a constitutional amendment becomes a part of the constitution and must be construed in pari materia with all of those portions of the constitution which have a bearing on the same subject. But a somewhat different rule prevails if a constitutional amendment conflicts with pre-existing provisions. In 11 Am.Jur., Sec. 54, p. 663, it is well said:

" 'A new constitutional provision adopted by a people already having well-defined institutions and systems of law should not

be construed as intended to abolish the former system, except in so far as the old order is in manifest repugnance to the new Constitution, but such a provision should be read in the light of the former law and existing system. Amendments, however, are usually adopted by the express purpose of making changes in the existing system. Hence, it is very likely that conflict may arise between an amendment and portions of a Constitution adopted at an earlier time. In such a case the rule is firmly established that an amendment duly adopted is a part of the Constitution and is to be construed accordingly. It cannot be questioned on the ground that it conflicts with pre-existing provisions. If there is a real inconsistency, the amendment must prevail because it is the latest expression of the will of the people.' "

and again in Moore v. Brown, 350 Mo. 256, 165 S.W.2d 657, at page 663, the Missouri Court has said: "One more point should be considered. We have just indicated the view that existing constitutional provisions may be amended or repealed by implication though an initiative amendment. But in any case such repeals are not favored, and there must be irreconcilable repugnance between the two. 12 C.J. #58, p. 709; 16 C.J.S., Constitutional Law, § 26, page 67, § 42b, pages 89, 90; 11 Am. Jur. # 54, pp. 663, 664. *All the more should this be true when such repugnancy must be pointed out in the abstract, and not in a pending controversy based on facts. Time alone can ferret out all the consequential and remote conflicts between statutes or constitutional provisions in all their implications.*" (Emphasis added).

With reference to the repeal of statutes by implication, this court has said: " * * * The repeal of statutes by implication is not favored. In the absence of express terms, it will be presumed that the legislature did not intend by a later act to repeal a former one, if by a fair and reasonable construction, effect can be given to both. To overcome such presumption, the two acts must be irreconcilable, i. e., clearly repugnant, as to vital matters to which they relate, and so inconsistent that the two cannot have concurrent operation." State v. Boyle, 67 Idaho 512, at page 523, 186 P.2d 859, at page 866.

We find no such inconsistency as will prevent the two sections from having concurrent operation.

The Alternative Writ is quashed and the permanent writ denied.

GIVENS, C. J., and BUDGE and HOLDEN, JJ., concur.

MILLER, Justice (dissenting).

In the case of State v. McMahan, 57 Idaho 240, at page 259, 65 P.2d 156, 164, Mr. Justice Budge, in his dissent therein, said: "It is useless and undesirable as a rule to express one's dissenting views." As a general rule I subscribe to the pro-

nouncement contained in the above quotation yet there are times when one cannot concur in a majority opinion without doing violence to his conscience and I feel myself in that position in the instant case, and being unable to concur there is no alternative except to dissent. I will briefly state my reasons therefor.

The majority opinion gives a detailed and accurate statement of the facts, so there will be no occasion for any statement thereof herein. There are three propositions involved and which have been approved by the majority, but to which I cannot subscribe, namely: (1) The legislative intent is not a matter of concern, or for consideration in the instant case; (2) The failure of the legislature to submit an amendment to Sec. 2, art. 4, of the Constitution, incident to the "time and place" of the election of executive officers; (3) The proposed amendment submitted two questions in a single amendment.

As to the first proposition, that is, that the legislative intent is not a matter for consideration we submit, that in proposing an amendment to the constitution the legislature obtains its authority therefor from the constitution itself. It is not required, and does not apply to the people for authorization so to do, but, on the contrary, turns to the constitution to ascertain what that instrument requires. That instrument, in Sec. 1, art. 20 says: "Any amendment or amendments to this constitution may be proposed in either branch of the legislature, and if the same shall be agreed to by two-thirds of all the members of each of the two houses, voting separately, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and it shall be the duty of the legislature to submit such amendment or amendments to the electors of the state at the next general election, and cause the same to be published without delay for at least six consecutive weeks, prior to said election, in not less than one newspaper of general circulation published in each county; and if a majority of the electors shall ratify the same, such amendment or amendments shall become a part of this constitution."

It is not for the court to propose the amendment to be submitted, nor correct it on the theory that the legislature intended it to be different than the proposed amendment which was submitted. At page 7, of Plaintiff's brief, it is said: "When the Legislature takes action in the field of proposals for constitutional amendments, it is acting in an entirely different capacity than when it is enacting legislation. In 11 Am.Jur. 633 it is stated, 'The power of the Legislature to initiate changes in the existing organic law is a delegated power and one which is generally to be strictly construed under the limitations imposed by the authority by which it has been conferred. In submitting propositions for the amendment of the Constitution, the legislature is not exercising its legislative pow-

er or any sovereignty of the people that has been intrusted to it, * * *.' "

In 11 Am.Jur. 633, supra, it is further said:

" * * * The extent of this power is limited to the object for which it is given and is measured by the terms in which it has been conferred; and it cannot be extended by the legislature to any other object or enlarged beyond these terms. Accordingly, it has been judicially stated that the legislature is not authorized to assume the function of a constitutional convention and propose for adoption by the people a revision of the entire Constitution under the form of an amendment or submit to their votes a proposition which, if adopted, would, by the very terms in which it is framed, be inoperative.

"It is usually held that a constitutional provision as to amending the Constitution, otherwise than by a convention, is mandatory, and not directory. The reason for such a construction is obvious. The Constitution is the organic and fundamental law, and to permit a change in it without strict adherence to the rules therein laid down would be a step in the direction of the destruction of the stability of the government."

At page 638 of 11 Am.Jur., it is said: "The general rule is that an amendment to a Constitution does not become effective as such unless it has been duly adopted in accordance with the provisions of the existing Constitution. The procedure and requirements estblished for the amendment of the fundamental law are mandatory and must be strictly followed, in order to effect a valid amendment. None of the requisite steps may be omitted."

The leading case on the above text is the case of Utter v. Moseley, 16 Idaho 274, 100 P. 1058, 133 Am.St.Rep. 94, 18 Ann.Cas. 723, and is cited among other authorities.

In 16 C.J.S., Constitutional Law, § 9, it is said: "The proposal by the legislature of amendments to the constitution is not the exercise of an ordinary legislative function; and it is not subject to the constitutional provisions regulating the introduction and passage of ordinary legislative enactments, * * *".

Regardless of some Idaho authorities to the contrary we think it is only necessary to refer to the case of State v. Enking, 62 Idaho 649, 115 P.2d 97, 99, for the last and best expression as to the right of a court to correct a constitutional proposal on account of "legislative intent" in connection therewith. In said case the same question was involved, as in the instant case, that is to say: Could the court take judicial notice of the fact that the word "State", the same as "State Auditor" had been inadvertently omitted from the constitutional proposal of 1927, so that endowment funds could not be loaned on "state bonds". State bonds were one of the three original classes of securi-

ties in which endowment funds could be invested, and everything pointed to the conclusion that it was the neglect of some clerk that it was not included in said proposal when submitted to the electors. The court in passing on said matter said: "If the people want to authorize the loaning of the permanent endowment funds on state bonds, they may authorize doing so by proper constitutional amendment, but since they have voted a change from the original Constitution and eliminated 'state bonds' as acceptable security, we are unauthorized to amend the Constitution by judicial construction or interpolation." It is thereby established that the court has no authority to determine what the legislative intent may have been or is and to write into a proposal, matter which should have been taken into account by the legislature.

As to proposition "(2)" that is, the failure of the legislature to submit an amendment to sec. 2 of art. 4 of the constitution so as to provide a "time and place" for the election of executive officers, we now find a conflict in the constitutional provisions. Section 1 of article 4, lists the executive officers, fixes their term of office and designates their place of residence. It states "each of whom shall hold office for four years, beginning on the first Monday of January next after his election, commencing with the election in the year 1946, *except as otherwise provided in this constitution.*" (Emphasis mine.) In other words, what is meant "except as otherwise provid-

ed in this constitution". Undoubtedly it means, that we must look elsewhere in the constitution to ascertain the time and place, when and where, executive officers will be elected. Section 2 of article 4 of the constitution states: "The officers named in section 1 of this article shall be elected by the qualified electors of the state at the time and places of voting for members of the legislature, and the persons, respectively, having the highest number of votes for the office voted for shall be elected; but if two or more shall have an equal and the highest number of votes for any one of said offices, the two houses of the legislature at its next regular session, shall forthwith, by joint ballot, elect one of such persons for said office. The returns of election for the officers named in section 1 shall be made in such manner as may be prescribed by law, and all contested elections of the same, other than provided for in this section, shall be determined as may be prescribed by law."

From the provisions of the foregoing section, it manifestly appears that the whole thereof is devoted to the election of executive officers and that the same should have been submitted as an amendment along with section 1, so as to provide the time and place for election of executive officers and eliminate from consideration the conflict that now exists by reason of the fact that section 2 has not been amended to meet the requirements of section 1 as now amended. It needs no authorities in support of the above observations. All that is necessary is

to read section 1 as amended and section 2 of article 4 and the answer is supplied. Under the present amendment we will have an election soon for members of the legislature, but there will be no election for state executive officers and the statement contained in section 1, as amended, "except as otherwise provided in this constitution" is meaningless and the purported amendment void.

We now come to the "(3)" proposition, which is, that the proposed amendment submitted two questions in a single amendment. Section 2 of Article 20, of the constitution provides: "If two or more amendments are proposed, they shall be submitted in such manner that the electors shall vote for or against each of them separately."

The provisions of the constitution are mandatory. Let us assume, for the purpose of illustration, that the proposed amendment was complete and needs no "judicial construction or interpolation" in the premises. The electors were called upon to determine whether or not the term of office of executive officers should be increased from two to four years. That constituted a complete question. It would be foolish to contend otherwise. The proposition that the governor could not succeed himself until after the lapse of one full term is plain and unambiguous and submits another question. Such question does not apply to other executive officers. A proposal to amend the constitution by limiting the governor, or any other executive offi-

cer, to a single term of office without an intervening period of time, would have been proper at any time and would constitute a complete amendment and include therein a complete question.

The proposition that the governor could not succeed himself in the amendment until after the lapse of one full term would be just as applicable if his term was limited to two years as it is with his term of office increased to four years and if such proposition had been submitted, without submitting the question of the increased term, it would have submitted a distinct and complete question to the electorate.

In the case of Mundell v. Swedlund, 58 Idaho 209, 229, 71 P.2d 434, the court had occasion to discuss the proposition of an amendment containing but a single question and cites a vast array of authorities incident thereto. In passing on the matter, it is said: "On this phase of the case we conclude that if the thing or things proposed can be divided into questions distinct and independent so that any one of them can be adopted without in any way being controlled, modified, or qualified by the other, then there are as many amendments as there are distinct and independent questions or subjects."

Among other authorities cited in said case is that of Kerby v. Luhrs, 44 Ariz. 208, 36 P.2d 549, 554, 94 A.L.R. 1502, and in which the Arizona court had occasion to discuss the identical question and among other things, said: "If the different chang-

es contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition. Nor does the rule as stated unduly hamper the adoption of legitimate amendments to the Constitution. Such a document was presumably adopted deliberately, after careful preparation, as a harmonious and complete system of government. Changes suggested thereto should represent the free and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire." See, also, Lane v. Lukens, 48 Idaho 517, 283 P. 532; McBee v. Brady, 15 Idaho 761, 100 P. 97; 12 C.J. 692; 16 C.J.S., Consitutional Law, § 9.

In Utter v. Moseley, supra, it is said [16 Idaho 274, 100 P. 1059]:

"Under the Constitution of this state certain necessary steps are provided for in order to submit a proposed amendment to the electors of the state for their approval or disapproval; and unless these steps are followed, as held in the case of McBee v. Brady, supra, the vote of the electors of the state becomes of no consequence and cannot vitalize the question voted upon into an amendment to the Constitution. * * *

"The failure of the Legislature to follow the requirements of the Constitution in submitting the proposed judicial amendment denied to the electors of the state an opportunity to express their will * * * and the vote thereon was of no force or effect."

Furthermore, quoting from Kerby v. Luhrs, supra, it is said: "Looking at the propositicn as reasonable men, we are of the opinion that the proposed amendment is a most glaring violation of the constitutional provision involved, in that it submits three separate propositions upon which each voter might, and many doubtless would, have widely different opinions, and in such manner that they are compelled either to reject all three on account of one which they may consider vicious, or else to accept two provisions they disapprove to secure the adoption of one which meets their favor. Such an amendment is logrolling of the worst. type, and violates both the spirit and the letter of the Constitution."

In connection with the above it might be stated, there probably were numerous elec-

tors who were in favor of a four year term but were not in favor of the term of the governor being limited to four years and then a lapse of one full term before he became eligible to again hold the office. Or, there may have been, and probably were, numerous electors who were not in favor of extending the term of the governor, or the other executive officers, to four years, but were highly in favor of limiting the term of the governor to one term and then a lapse of at least one full term before he would be eligible to again hold the office of governor. Therefore, in voting the thing they favored they were compelled to vote for something they did not desire.

In the instant case there is no relation between the proposition of increasing the term of office of the governor and the further proposition that he is ineligible to serve more than one term without an intervening period of time.

The matter of increasing the term of the governor from two to four years, does not refer to, nor is it in any manner related to the further proposition that an intervening period of time must elapse before a governor is again eligible to qualify for the office.

The purported constitutional amendment as proposed by Senate Joint Resolution No. 1, is void, and this court should so hold. The writ should be made permanent and the Secretary of State required to accept declarations of candidacy as prayed for by plaintiff.